DOWNEY BRAND LLP
JAMIE P. DREHER (Bar No. 209380)
jdreher@downeybrand.com
SEAN J. FILIPPINI (Bar No. 232380)
sfilippini@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone:    916.444.1000
Facsimile:    916.444.2100

Attorneys for ANVIL POWER, INC., ANVIL
EQUIPMENT COMPANY LP,, ANVIL
BUILDERS, ANVIL HOLDINGS, INC., ANVIL
GROUP, LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>Kingsborough Atlas Tree Surgery, Inc. ,<br><br>        Debtor.<br>_____<br><br>Kingsborough Atlas Tree Surgery, Inc.,<br><br>        Plaintiff,<br><br>        v.<br><br>Anvil Power, Inc., a California corporation, Anvil Equipment Company LP, a California limited partnership, Anvil Builders, a California corporation, Anvil Holdings, Inc., a California corporation, Anvil Group, LLC, a California limited liability company,<br><br>        Defendants. | Case No. 25-10088 WJL<br><br>Chapter 11<br><br>**DECLARATION OF RICHARD LEIDER IN SUPPORT OF OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND TO COMPEL TURNOVER OF PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. SECTION 542**<br><br>Judge:   Hon. Hon. William J. Lafferty<br>Date:    March 26, 2025<br>Time:   10:30 a.m. |

I, Richard Leider, declare as follows:

    1.    I am  the Chief Administrative Officer of Anvil Builders, Inc., and Anvil Power,

Inc. (together referred to as "Anvil").  I have acted in the role of Chief Administrative Officer

since 2019.  I have personal knowledge of the facts stated in this declaration and, if sworn as a

Declaration of Richard Leider

DOWNEY BRAND LLP

1  witness, could and would competently testify thereto.

2      2.      I have reviewed the declaration of Richard Kingsborough in Support of

3  Kingsborough Atlas Tree Surgery, Inc.'s ("KBA") Motion for TRO and Preliminary Injunction.

4  At the outset, I note that I have had a very limited amount of time to investigate and analyze the

5  issues raised by Mr. Kingsborough's declaration.  This is due to the fact that I was not notified of

6  it until the night of March 20, 2025.  Nevertheless, in the limited time that I have had to

7  investigate the issues and assertions, I note that there are a number of mischaracterizations in his

8  declaration pertaining to KBA's relationship with Anvil as well as various other inaccuracies

9  pertaining to the equipment that is the subject to KBA's Motion.  I further note that at paragraphs

10  17-20 of his declaration, Mr. Kingsborough asserts that KBA equipment has been improperly

11  maintained.  Yet, to my knowledge, Mr. Kingsborough has never been involved in any

12  maintenance of the equipment and has never communicated with me (or anyone else at Anvil that

13  I am aware of) about the maintenance of the equipment.  And he has certainly never expressed any

14  concerns about Anvil's maintenance of the equipment.  Thus, based on my knowledge, Mr.

15  Kingsborough has no personal knowledge about the assertions he has advanced about equipment

16  maintenance in his declaration.

17      3.      My responsibilities as CAO of Anvil included direct involvement in Anvil's

18  acquisition of the assets owned by Kingsborough Atlas Tree Surgery, Inc. through a June 5, 2023

19  Asset Purchase Agreement (the "APA") together with a number of related agreements which

20  provided Anvil with collateral and security for a significant investment that Anvil made in the

21  KBA assets.  A true and correct copy of the APA is attached hereto as **Exhibit 1**.

22      4.      Pursuant to the APA, Anvil acquired KBA's trademarks and goodwill.

23  Additionally, Anvil also acquired assignments of various agreements with third parties which

24  KBA was performing at the time of the APA.

25      5.      Although the APA had provisions for the sale of equipment to Anvil, the provisions

26  to purchase equipment provided Anvil with the unilateral option to purchase equipment—

27  providing that equipment would be sold to Anvil that was "designated by written notice from

28  Anvil Equipment to Seller."  (APA, Sec. 1.01(c).)

6. Anvil explored the purchase of a significant amount of the KBA equipment. However, Anvil ultimately purchased a smaller amount of KBA equipment due to the fact that large portions of KBA equipment were encumbered by debt and cross-collateralized by numerous creditors. Thus, KBA's debt load was a significant barrier to Anvil's ability to purchase significant amounts of the KBA equipment and own it free and clear. Nevertheless, Anvil was able to work out purchases with a number of KBA creditors such as Caterpillar, Captech, and Armada. In those instances, Anvil purchased KBA equipment. As to the other portions of KBA equipment (that were not purchased), Anvil and KBA subsequently entered into a lease agreement wherein Anvil leased equipment from Anvil beginning in June 19, 2023.

7. At the same time as the APA, KBA and Anvil also entered into a separate "Line of Credit and Security Agreement" (the "Security Agreement") wherein KBA pledged all of its equipment as collateral for advances made by Anvil that were made in conjunction with the APA. A true and correct copy of the "Line of Credit and Security Agreement" is attached hereto as **Exhibit 2**.

8. The Security Agreement provided that Anvil was authorized to record Financing Statements with the California Secretary of State pertaining to its security interest in KBA's equipment. Anvil proceeded to file a UCC Financing Statement against KBA's equipment in June 2023. A true and correct copy of Anvil's UCC Financing Statement is attached hereto as **Exhibit 3**.

9. The Security Agreement further provided that upon default, Anvil "shall have the immediate right to possession of the Collateral [which included all equipment]." (See Security Agreement, Sec. 2.5.)

10. KBA breached its relevant agreements with Anvil in numerous respects, including, but not limited to, breaching warranties and representations—which are express breaches of those agreements. As a result, on February 5, 2025, I sent Richard Kingsborough a series of letters declaring KBA in default of the Security Agreement and outlining the total amounts owing to Anvil under the relevant agreements that was due and owing. I have attached a February 5, 2025 letter that I sent to Mr. Kingsborough outlining and itemizing the $4,619,490.28 that KBA owed to

DOWNEY BRAND LLP

Declaration of Richard Leider

DOWNEY BRAND LLP

1  Anvil under the agreements as **Exhibit 4**.  And I have also attached a separate February 5, 2025

2  letter that I also sent to Mr. Kingsborough declaring KBA under default under the terms of the

3  Security Agreement as **Exhibit 5**.

4         11.     With respect to Mr. Kingsborough's assertions relating to Anvil's improper

5  maintenance of the equipment, those assertions are not accurate.  As an initial matter, Anvil

6  maintains an in-house team of mechanics that regularly service all equipment that it utilizes.

7         12.     Anvil's team of in-house mechanics has regularly maintained all of the KBA

8  equipment that it has utilized pursuant to industry standards.  In fact, the majority of the KBA

9  equipment was in very poor condition at the time Anvil began utilizing it.  Thus, Anvil has

10  invested substantially more maintenance into the KBA equipment than would otherwise be

11  required given that it was in poor condition at the time KBA provided it.

12         13.     With respect to the assertion that a tub grinder was destroyed in Anvil's possession,

13  Mr. Kingsborough's declaration omits important context.  In is correct that a tub grinder was

14  destroyed by a fire while in Anvil's possession because the tub grinder had a mechanical

15  malfunction that led to the fire.  However, what Mr. Kingsborough's declaration omits is that

16  Anvil provided insurance on that tub grinder and made a claim on its insurance policy.  The result

17  was that Anvil's insurer made a determination as to the value of the equipment in excess of

18  $500,000.  Anvil then communicated that a payment would be forthcoming to KBA and the third

19  party equipment lender that held a security interest in the tub grinder.  After that, Richard

20  Kingsborough's wife, Cindy, began communicating with the insurance company and arguing with

21  it that its valuation/payout should be higher.  Regardless, it is clear that KBA will ultimately be

22  paid for the value of the tub grinder, and KBA will experience no resulting financial loss.

23         14.     At paragraph 19 of Mr. Kingsborough's declaration he asserts that Anvil engaged

24  in conduct where it was: "secreting and removing KBA equipment and failure to maintain said

25  equipment in [sic] good working condition or negligence in operating such equipment…"

26         •   Nowhere in Mr. Kingsborough's declaration does he describe any instance where

27             Anvil "secreted and removed KBA equipment."  Moreover, I am not aware of any

28             such conduct and do not believe that any such conduct has ever been perpetrated by

1     Anvil.

2     •   With respect to maintenance, issues: 1) Mr. Kingsborough does not have any

3          knowledge of Anvil's maintenance practices and at no point (prior to his

4          declaration) did he ever express concern about maintenance. To the contrary, and

5          also as set forth above, Anvil conducted repeated and regular maintenance on the

6          KBA equipment. In fact, 2-3 times more maintenance than normal given the poor

7          condition of the equipment at the time it was provided by KBA.

8     •   And with respect to the assertion of negligent operation, Mr. Kingsborough's

9          declaration is silent as to any specific instance where that occurred. To my

10        knowledge, there has never been an instance of negligent operation.

11      15.    I have reviewed the Equipment List that was attached to Richard Kingsborough's

12  Declaration in support of this Motion as Exhibit A. Given the short period of time to respond to

13  this Motion, I have not comprehensively analyzed every piece of equipment identified. That said,

14  I have reviewed the list and determined that it is not accurate. There are at least 9 different items

15  of equipment on Mr. Kingsborough's list that are not in Anvil's possession. Those nine

16  discrepancies appear on the second to last page of Mr. Kingsborough's list. Specifically, nine

17  "Connex" items of equipment are not in Anvil's possession.

18      16.    The Motion requests that, among other things, Anvil be ordered to "turn over" each

19  piece of the equipment. But it is silent on how that should occur. To the extent that the Court is

20  inclined to grant any of the requested relief, Anvil respectfully requests that the Court's order be

21  that KBA is required to come and get any such equipment from Anvil. Transportation of the

22  equipment is costly and time consuming. Moreover, it is unclear whether KBA has an appropriate

23  location to receive the equipment in the event that Anvil was required to deliver it.

24

25      I declare under the penalty of perjury under the laws of the United States of America that

26  the foregoing is true and correct and if called upon would and could competently testify thereto.

27      Executed this 25th day of March, 2025, at Emeryville, California.

28

Declaration of Richard Leider

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1

2

3 RICHARD J LEIDER

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Richard Leider

# Exhibit 1

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of June 5, 2023, is entered into among KINGSBOROUGH ATLAS TREE SURGERY, INC., a California corporation ("**Seller**"), RICHARD KINGSBOROUGH and CINDY KINGSBOROUGH (collectively, "**Shareholders**" and each individually, a "**Shareholder**") and ANVIL POWER, INC., a California corporation ("**Anvil Power**") and ANVIL EQUIPMENT COMPANY LP, a California limited partnership ("**Anvil Equipment**"). Seller and Shareholders are sometimes referred to in this Agreement as "**Seller Parties**" and each individually as a "**Seller Party**". Anvil Power and Anvil Equipment are sometimes referred to in this Agreement collectively as "**Buyers**" and individually as "**Buyer**". This Agreement is entered into under the following circumstances:

## RECITALS

A.      Seller is engaged in the business of residential, commercial, and governmental tree service (the "**Business**"). Shareholders own all of the outstanding capital stock of Seller.

B.      Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, certain of the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets.**

(a)      <u>Sale to Anvil Power</u>.  Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Anvil Power, and Anvil Power shall purchase from Seller, all of Seller's right, title, and interest in, to, and under the tangible and intangible assets, properties, and rights described below, wherever located (collectively, the "**Anvil Power Purchased Assets**"):

(i)      All agreements with Pacific Gas & Electric Co. ("**PG&E**"), and other agreements with customers to the extent that they are assignable (the "**Assigned Contracts**");

(ii)      All tradenames, trademarks, websites and business telephone numbers;

(iii)      All goodwill and going concern value;

1

(iv)    Insurance policies (general liability with fire exclusion and others) that are designated by Anvil Power in writing, if any, that satisfy PG&E's requirements (the "**Assigned Insurance Policies**"); and

(b)    All  small tools etc. (chainsaws, safety gear, vests etc.).

(c)    <u>Sale to Anvil Equipment</u>.  Subject to the terms and conditions set forth herein, at the Closing initially, and after the Closing at any time designated by Anvil Equipment within thirty (30) days after the date of this Agreement, Seller shall sell, convey, assign, transfer, and deliver to Anvil Equipment, and Anvil Equipment shall purchase from Seller, all of Seller's right, title, and interest in, to, and machinery, tools, vehicles, excluding personal vehicles, office equipment, and other tangible personal property designated by written notice from Anvil Equipment to Seller, wherever located, together with all of Seller's rights under warranties, indemnities, and similar rights against third parties relating to any property described in this paragraph (collectively, the "**Anvil Equipment Purchased Assets**").

**Section 1.02    Assumed Liabilities.**

(a)    Subject to the terms and conditions set forth herein, Anvil Power shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller (collectively, the "**Anvil Power Assumed Liabilities**"), and no other Liabilities:

(i)    all Liabilities in respect of the Assigned Contracts and the Assigned Insurance Policies, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business, and do not relate to any failure to perform, improper performance, warranty, or other breach, default, or violation by Seller on or prior to the Closing; and

(ii)    Accrued Paid Time Off (PTO) and vacation liabilities with respect to Seller's employees who are hired by Buyer, up to an aggregate amount of $200,000 (the "**Accrued PTO Liability**").

For purposes of this Agreement, "**Liabilities**" means liabilities, obligations, or commitments of any nature whatsoever, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

(b)    Notwithstanding any provision in this Agreement to the contrary, Buyers shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). For purposes of this Agreement: (i) "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (ii) the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

2

**Section 1.03    Purchase Price.**

(a)    The aggregate purchase price for the Anvil Power Purchased Assets (the "**Anvil Power Purchase Price**") shall be (i) $690,000 (the "**Anvil Power Fixed Component**"), (ii) the assumption of the Anvil Power Assumed Liabilities, and (iii) a percentage of the Net Profit from the Assigned Contracts during the five (5) Years (as defined below) after the Closing, determined as follows:

| Year | Profit Percentage |
|------|-------------------|
| 1 and 2 | 35% |
| 3 | 25% |
| 4 | 20% |
| 5 | 15% |

(b)    "**Net Profit**" shall equal revenue minus expenses.  Expenses shall include:

(i)    All job expenses directly related to the Assigned Contracts;

(ii)    All labor costs (direct and management), including all taxes, benefits, 401K contributions and costs, bonuses, and insurance premiums prorated for services provided under the Assigned Contracts;

(iii)    All equipment necessary for the Assigned Contracts, to be charged to jobs at Anvil Power's internal rates (lower than market rates); and

(iv)    Anvil Power's actual overhead of 4% to 9% for the applicable year.

For purposes of determining Net Profit, each "**Year**" shall begin on the first day of the calendar month on or after the Closing, and on the same day of each succeeding calendar year, and shall conclude on last day of the twelfth month immediately thereafter.  Net Profit shall be determined in accordance with generally accepted accounting principles by the independent accountants then servicing Anvil Power.

(c)    **Payment of Net Profit; Audit Right.**  Within one hundred twenty (120) days after the end of each Year, Anvil Power shall deliver to Seller a calculation of Net Profit, if any, or if there is no Net Profit, a calculation of Anvil Power's net loss from the Assigned Contracts (a "**Net Profit Statement**"), for the immediately preceding Year together with payment of the applicable Profit Percentage. Seller shall have the right, during Anvil Power's regular business hours after not less than ten (10) business days' prior notice, to inspect books and records and all other documents and material, in whatever form, that are in the possession of or under the control of Buyers, Anvil Builders Inc., a California corporation ("**Anvil Builders**"), and any of Buyers' or Anvil Builders' Affiliates with respect to the calculation of Net Profit, including but not limited

3

to all records relating to the job expenses, labor costs, equipment costs, and overhead, at the place or places where such records are normally retained by Buyers, Anvil Builders, or an Affiliate of Buyers or Anvil Builders, provided that Seller's inspection right with respect to the Net Profit reported on a Net Profit Statement shall terminate one year after the delivery to Seller of such Net Profit Statement. If such inspection reveals an underpayment of five percent (5%) or more of the amounts owed for the period being inspected or if the inspection results in a Net Profit of which Seller is entitled to a portion and no Profit Percentage was paid, Buyers shall reimburse Seller for its reasonable costs and expenses incurred in connection with such examination. Buyers shall immediately repay Seller the amount of any underpayment discovered plus interest at an annual rate of ten percent (10%) prorated by the number of days from the original payment date to the repayment date.

(i)     All books and records related to each Net Profit Statement shall be maintained and kept accessible and available to Seller for inspection for at least one (1) year after the date of delivery of the Net Profit Statement to Seller.

(ii)     If an investigation of Buyers', Anvil Builders', or Buyers' or Anvil Builders' Affiliate's books and records is made, certain confidential and proprietary business information of Buyers, Anvil Builders, or an Affiliate of Buyers or Anvil Builders may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be retained in confidence by Seller and shall not be used by Seller or disclosed to any third party without the prior express written permission of Seller, unless required by law. It is understood and agreed, however, that such information may be used in any proceeding based on Buyers' underpayment of an applicable Profit Percentage pursuant to this Agreement or refusal to pay an applicable Profit Percentage.

(d)     The aggregate purchase price for the Anvil Equipment Purchased Assets (the "**Anvil Equipment Purchase Price**") shall be the value of the Anvil Equipment Purchased Assets as determined by Buyers and Seller after reviewing the Ritchie Brothers Auctioneers valuation and the FLV values set forth in the California Bank of Commerce valuation, provided that the Anvil Equipment Purchase Price shall not exceed thirty million dollars $30,000,000.

**Section 1.04   Payment of Purchase Price.**

(a)     Anvil Power shall pay the Anvil Power Fixed Component, which shall be reduced by the Accrued PTO Liability, in cash at closing, or Anvil Builders may pay all or any portion of the Anvil Power Purchase Price on behalf of Anvil Power by setting off all or any portion of the Anvil Power Purchase Price against the amount then owing by Seller to Anvil Builders pursuant to the Line of Credit and Security Agreement dated the date of this Agreement between Anvil Builders and Seller (the "**Line of Credit Agreement**").

(b)     Anvil Equipment shall pay the Anvil Equipment Purchase Price in cash at closing, or Anvil Builders may pay all or any portion of the Anvil Equipment Purchase Price on behalf of Anvil Power by setting off all or any portion of the Anvil Equipment Purchase Price against the amount then owing by Seller to Anvil Builders pursuant to the Line of Credit

4

Agreement (reduced by any reduction in the balance owing pursuant to paragraph (a) immediately above.

(c)     The cash portion of the purchase prices payable by Buyers shall be applied at the Closing in the following order and priority:

(i)     First, to fully satisfy the amount owing to any secured lender on any item of equipment purchased by Anvil Equipment;

(ii)     Second, to fully satisfy any payoff demand from California Bank of Commerce with respect to the assets that are acquired;

(iii)     Third, to satisfy any claims or liens for taxes (other than taxes not yet due and payable); and

(iv)     Fourth, to Seller.

**Section 1.05     Allocation of Purchase Price.** The Anvil Power Purchase Price and the Anvil Equipment Purchase Price (collectively, the "**Purchase Price**") and the Assumed Liabilities shall be allocated among the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets (collectively, the "**Purchased Assets**") for all purposes (including Tax and financial accounting) as shown on the allocation schedule to be agreed upon by the parties before the Closing and set forth on Exhibit 1.05 (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller shall file all returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("**Tax Returns**") in a manner consistent with the Allocation Schedule.

**Section 1.06     Existing Contracts.** Exhibit 1.06 lists certain material contracts of Seller (the "**Specified Contracts**"). If, at the end of the contracted work under each Specified Contract, (i) actual costs incurred following the Closing for any Specified Contract exceeds total revenue received following Closing under such Specified Contract and (ii) the Assigned Contracts as a whole have not been profitable in the period from Closing, then Seller shall reimburse Buyer for the amount that actual costs exceed total revenue on any such Specified Contract.

**Section 1.07     Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 1.08     Third-Party Consents.** To the extent that Seller's rights under any Purchased Asset may not be assigned to Buyers without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyers' rights under the Purchased Asset in question so that Buyers would not in

5

effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyers' agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyers in any other reasonable arrangement designed to provide such benefits to Buyers.

## ARTICLE II
## CLOSING

**Section 2.01  Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Buyer or remotely by exchange of documents and signatures (or their electronic counterparts), (i) at 10:00 a.m. on July 3, 2023 or (ii) not less than not less than two days after the Conditions to Closing set forth in Article VI have been satisfied, whichever is later, or at such other time or place or in such other manner as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

**Section 2.02  Closing Deliverables.**

(a)  At the Closing, Seller shall deliver to Buyer the following:

(i)  a bill of sale (the "**Bill of Sale**") duly executed by Seller, transferring the Anvil Equipment Purchased Assets to Anvil Equipment;

(ii)  an assignment and assumption agreement (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Anvil Power of the Anvil Power Purchased Assets and the Assumed Liabilities;

(iii)  a certificate of the Secretary of Seller certifying as to (A) the resolutions of the board of directors and the shareholders of Seller, which authorize the execution, delivery, and performance of this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "**Transaction Documents**") and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the other Transaction Documents; and

(iv)  such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement.

(b)  At the Closing, Buyers shall deliver to Seller the following:

(i)  the purchase prices payable by Buyers determined pursuant to Section 1.03 (subject to Section 1.04(c));

6

(ii)      the Assignment and Assumption Agreement duly executed by Anvil Power; and

(iii)      Certificates of the Secretary (or equivalent officer) of Buyers certifying as to (A) the resolutions of the boards of directors of Buyers, which authorize the execution, delivery, and performance of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Buyers authorized to sign this Agreement and the other Transaction Documents.

(c)      At the Closing, Richard Kingsborough and Anvil Power shall enter into an Employment Agreement having a five (5) year term, subject to early termination for cause.

# ARTICLE III
# REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Seller Parties jointly and severally represent and warrant to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing, and in good standing under the Laws of the State of California. Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate, board, and shareholder action on the part of Seller. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms.  Shareholders own all of the issued and outstanding shares of capital stock of Seller, free and clear of any liens, encumbrances or options.

**Section 3.02   No Conflicts or Consents.** The execution, delivery, and performance by Seller Parties of this Agreement and the other Transaction Documents to which they are a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of Seller; (b) violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, **"Law"**) or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority (**"Governmental Order"**) applicable to Seller, the Business, or the Purchased Assets; (c) require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity (**"Person"**) or require any permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create

7

in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("**Encumbrance**") on the Purchased Assets.

**Section 3.03    Undisclosed Liabilities.** Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Balance Sheet of Seller as of February 28, 2023 (the "**Balance Sheet Date**"), and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

**Section 3.04    Assigned Contracts.** Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither Seller nor, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. No event or circumstance has occurred that would constitute an event of default under any Assigned Contract or result in a termination thereof. Complete and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Assigned Contract.

**Section 3.05    Title to Purchased Assets.** Seller has good and valid title to all the Purchased Assets, free and clear of Encumbrances, other than (a) the security interest held by California Bank of Commerce, and (b) security interests held by lenders in specific items of equipment included in the Anvil Equipment Purchased Assets.

**Section 3.06    Condition of Assets.** Each item of the Anvil Equipment Purchased Assets is in good operating condition and repair, and is adequate for the uses to which it is being put, and no item of the Anvil Equipment Purchased Assets is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost."

**Section 3.07    Legal Proceedings; Governmental Orders.**

(a)    There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "**Actions**") pending or, to Seller's knowledge, threatened against or by Seller: (i) relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)    There are no outstanding Governmental Orders against, relating to, or affecting the Business or the Purchased Assets.

8

**Section 3.08   Compliance with Laws.** Seller is in compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

**Section 3.09   Taxes.** All Taxes due and owing by Seller have been, or will be, timely paid. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller. All Tax Returns required to be filed by Seller for any tax periods prior to Closing have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete, and correct in all respects. The term "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, withholding, payroll, employment, unemployment, excise, severance, stamp, occupation, premium, property (real or personal), customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto.

**Section 3.10   Brokers.** Except for Baserock Partners, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 3.11   Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of California. Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02   No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the articles of incorporation, bylaws, or other organizational documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 4.03   Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 4.04   Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.05   Buyer Investigation.** Buyer acknowledges and agrees that in no event shall Seller have any liability to Buyer with respect to the breach of any representation, warranty, or covenant in this Agreement to the extent Buyer knew of such breach as of the Closing or Closing Date.

## ARTICLE V
## COVENANTS

**Section 5.01   Confidentiality.** From and after the Closing, Seller Parties shall, and shall cause their Affiliates to, hold, and shall use their reasonable best efforts to cause their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("**Representatives**") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If Seller Parties or any of their Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.02   Employees.**

(a)     Upon the Closing, Anvil Power and/or an Affiliate of Anvil Power shall offer employment to substantially all of Seller's employees for substantially the same pay, benefits and positions.  Seller shall cooperate with Anvil Power's recruitment of Seller's employees.

(b)     After the Closing, neither Anvil Power nor any Affiliate shall terminate 50 or more employees or change their compensation, benefits (including retirement plans, health insurance, vacation and sick days), level of seniority, working conditions or job responsibilities within thirty (30) days after Closing.

**Section 5.03   Real Property.**   Effective as of the Closing, Anvil Power and Anvil Equipment shall sublease or license some of the real property occupied by Seller on a month-to-month basis at rates equal to the per square foot rental rates paid by Seller on properties not owned by Shareholders, and fair market value on properties owned by Shareholders (to be negotiated) for a period not to exceed ninety (90) days. Thereafter, Anvil Power and/or Anvil Equipment intend to lease or sublease certain real property presently occupied by Seller on a longer term basis after a review of their post-closing operations and anticipated needs; provided that neither Anvil Power nor Anvil Equipment shall be required to lease or sublease any such property after the ninety (90) day period after the Closing has elapsed.  The parties intend that for properties owned by Shareholders, the terms of such leases or subleases will be based on their current fair market value (to be negotiated) for a period of up to 5 years and include an option to renew such leases or subleases for a period of up to 5 years at their then fair market value or agreed upon escalation percentage.  During the ninety (90) day period after the Closing, Anvil Power shall have a right of first refusal with respect to the sublease or assignment of each lease.

**Section 5.04   Conduct of Business.**  Until the Closing, Seller shall conduct its business diligently and in substantially the same manner as it has previously been carried out.

**Section 5.05   Public Announcements.**  Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.06   Receivables.**  From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any services rendered by Anvil Power or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Anvil Power within five (5) business days after its receipt thereof. From and after the Closing, if either Buyer or its Affiliate receives or collects any funds relating to any services rendered by Seller, Buyer or its Affiliate shall remit any such funds to Seller within five (5) business days after its receipt thereof.

**Section 5.07   Transfer Taxes.**  All sales, use, registration, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents, if any, shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 5.08 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 5.09 Third Party Consents.** Each party agrees to cooperate with the others in connection with the transition of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets from Seller to Buyers and the assumption of the Assigned Contracts, including without limitation obtaining consents, authorizations, orders and approvals in writing from Pacific Gas & Electric that are required to assign the PG&E Contracts to Anvil Power, in each case, in form and substance reasonably satisfactory to Anvil Power and Seller and obtaining any releases of any guaranties associated with the Assigned Contracts. The parties will cooperate with the notification of third parties of Buyers' acquisition of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets or assumption of the Assigned Contracts and will further cooperate with obtaining all applicable third-party consents and approvals, and release of any personal guaranties associated with the Assigned Contracts (provided that no such release shall be a condition to Closing). To the extent that Seller's rights under any of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets may not be assigned to Buyers without the consent of another Person which has not been obtained as of Closing (a "**Restricted Asset**"), this Agreement shall not constitute an agreement to sell, assign, transfer or deliver the Restricted Asset. Following Closing, Seller shall use commercially reasonable efforts, and cooperate with Buyers' requests, to obtain the Consent(s) relating to each Restricted Asset as soon as practicable. Pending the obtaining of such Consents relating to any Restricted Asset, the parties shall cooperate with each other in any reasonable and lawful arrangements designed to provide to Buyers the benefits of use of such Restricted Asset (or any right or benefit arising thereunder, including the enforcement for the benefit of Buyers of any and all rights of the applicable Seller against a third party thereunder). Once any necessary Consent to the sale, conveyance, assignment, transfer and delivery of a particular Restricted Asset is obtained, the Restricted Asset shall then be deemed to be a Purchased Asset.

**ARTICLE VI**
**CONDITIONS TO CLOSING**

**Section 6.01 Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a) No governmental authority shall have enacted, issued, promulgated, enforced or entered any governmental order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

12

(b)     California Bank of Commerce shall have delivered a written payoff demand providing for the release of its security interest in the Anvil Equipment Purchased Assets upon receipt of a cash payment.

(c)     Buyers shall be satisfied, in their sole discretion, with their due diligence investigation of Seller and the assets to be acquired by Buyers pursuant to this Agreement.

(d)     The parties shall have agreed to the valuation of the Anvil Equipment Purchased Assets, which shall not exceed the specific amount set forth in Section 1.03(d).

**Section 6.02   Conditions to Obligations of Buyer.**   The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Seller contained in Section 3.01, Section 3.02, and Section 3.10, the representations and warranties of Seller contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality) or in all material respects (in the case of any representation or warranty not qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in Section 3.01, Section 3.02, and Section 3.10 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(e)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

13

**Section 6.03 Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a) Other than the representations and warranties of Buyer contained in Section 4.01 and Section 4.02, the representations and warranties of Buyer contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or material adverse effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in Section 4.01 and Section 4.02 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b) Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c) No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d) Buyers and Seller agree on the purchase price for the Anvil Equipment Purchased Assets, which shall not exceed the specific amount set forth in Section 1.03(d).

**ARTICLE VII**
**INDEMNIFICATION**

**Section 7.01 Survival.** All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 7.02 Indemnification by Seller.** Subject to the other terms and conditions of this ARTICLE VIII, from and after Closing, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees (collectively, "**Losses**"), incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, or with respect to:

(a) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such

14

representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Seller pursuant to this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto;

(c)     any asset of Seller that is not acquired by Buyers pursuant to this Agreement or any Liability of Seller that is not assumed by Buyers pursuant to this Agreement; or

(d)     any Third-Party Claim based upon, resulting from, or arising out of the business, operations, properties, assets, or obligations of Seller or any of its Affiliates conducted, existing, or arising on or prior to the Closing Date. For purposes of this Agreement, "**Third-Party Claim**" means notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing.

**Section 7.03   Indemnification Basket**.   Seller shall not be liable to the Buyer Indemnitees for indemnification under Section 7.02 until the aggregate amount of all Losses in respect of indemnification under Section 7.02 exceeds $50,000 (the "*Basket*"), in which event Seller shall be required to pay or be liable for all such Losses that exceed the Basket.

**Section 7.04   Indemnification Cap.**  In no event shall the aggregate amount of Losses for which the Buyer Indemnities shall be entitled to indemnification under this ARTICLE VII shall exceed the sum of (i) the Anvil Power Fixed Component, (ii) the Profit Percentage payments, and the Anvil Equipment Purchase Price less debt owed by Seller on the equipment sold to Buyer.

**Section 7.05   Indemnification by Buyer.**  Subject to the other terms and conditions of this ARTICLE VII, from and after Closing, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, or with respect to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement; or

(c)     any Assumed Liability.

**Section 7.06  Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 7.07  Cumulative Remedies.** The rights and remedies provided in this ARTICLE VII are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01  Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; *provided, however*, Seller shall pay all amounts payable to Baserock Partners.

**Section 8.02  Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

**If to Seller:**     Mr. Richard Kingsborough
Ms. Cindy Kingsborough
Kingsborough Atlas Tree Surgery, Inc.
1544 Ludwig Avenue
Santa Rosa, CA 95407

Email: rich@atlas-tree.com

**If to Buyer:**    Mr. Alan C. Guy
Anvil Builders Inc
1550 Park Avenue
Emeryville, CA 94608
Email: alan@anvilbuilders.com

 **Section 8.03  Interpretation; Headings.**  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

 **Section 8.04  Severability.**  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

 **Section 8.05  Entire Agreement.**  This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents.

 **Section 8.06  Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

 **Section 8.07  Amendment and Modification; Waiver.**  This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

 **Section 8.08  Governing Law.**  All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

**Section 8.09  Arbitration.**  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Alameda County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

**Section 8.10  Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signatures on following page]*

18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

KINGSBOROUGH ATLAS TREE SURGERY, INC.
a California corporation

By _Richard Kingsborough_____
Richard Kingsborough
Chief Executive Officer

_Richard Kingsborough_____
RICHARD KINGSBOROUGH, individually

_Cindy Kingsborough_____
CINDY KINGSBOROUGH, individually

ANVIL BUILDERS INC
a California corporation

By _Alan C. Guy_____
Alan C. Guy
Chief Executive Officer

19

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

**EXHIBIT A**

Ex A

# EXHIBIT 1.05
# PURCHASE PRICE ALLOCATION

Ex 1.05

# EXHIBIT 1.06

## EXISTING CONTRACTS

**Current Atlas Contracts for Forest management
and Heavy Com 6/6/23**

| Contract Name | Client |
|---|---|
| El Dorado Resource-SAT Phase II | El Dorado Resource Conservation District |
| WUI Vegetation Management - City of Chula Vista | City of Chula Vista |
| 04A6314- District 4 Maintenance | California Department of Transportation |
| STD213 - Caltrans_ Vegetation Management, Tree Removal Services, and Brush Mastication services in Siskiyou County (IFB 02A2068) | California Department of Transportation |
| NFF - Liberty Utilities Resilience Corridor – Phase 1_625 Line Project | National Forest Foundation |
| County of El Dorado - Caldor Fire Right-of-Way Tree Removal Services | County of El Dorado |
| MCRCD-Northern Red Mtn Forest Health Improvement | Mendocino Resource Conservation District |
| 04A6441- District 4 Maintenance- Foster City | California Department of Transportation |
| 04A6568- District 4 Stump Grinding | California Department of Transportation |

Ex 3.03

# Exhibit 2

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

# LINE OF CREDIT AND SECURITY AGREEMENT

This Agreement is made and entered into as of June 5, 2023 between KINGSBOROUGH ATLAS TREE SURGERY, INC., a California corporation ("**Borrower**") and ANVIL BUILDERS INC., a California corporation ("**Lender**").

1.     The Loan.

       1.1     Advances.  Subject to the limitations set forth below, from time to time and upon the request of Borrower, Lender has advanced to Borrower a total of $1,180,000 on the terms and conditions hereinafter set forth, and may in its sole discretion lend in the future additional sums requested by Borrower on such terms and conditions (individually, an "**Advance**", and collectively, the "**Advances**").  The total aggregate amount of all outstanding Advances plus all accrued but unpaid interest thereon may be referred to as the "**Loan**."

       1.2     Use of Proceeds.  The Advances shall be used solely to pay Borrower's payroll and equipment financing expenses and other expenses approved by Lender.

       1.3     Promissory Note.  The obligation of Borrower to repay the Loan shall be evidenced by a Subordinated Secured Promissory Note (the "**Note**") dated the date of this Agreement.

       1.4     Term of Commitment.  Lender's commitment to lend under this Agreement shall terminate on June 30, 2023.

       1.5     No Advances if Default.  As a condition precedent to Lender's obligation to make any Advance, on and as of the date of such Advance, there shall not exist an Event of Default or an event which, with the giving of notice or passage of time, or both, would be an Event of Default.

2.     Security Interest.

       2.1     Grant of Security Interest.

              (a)     Borrower hereby grants to Lender a junior security interest in all present and future tangible and intangible property of Borrower, including, but not limited to, (1) goods, inventory, work in process, finished goods, equipment, furniture and proceeds therefrom, (2) money, documents, instruments, accounts, chattel paper, and (3) licenses, franchises, permits, patents, patent rights, copyrights, works which are the subject matter of copyrights, trademarks, trade names, trade styles, patent and trademark applications and licenses and rights thereunder, and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing, and all rights to sue for past, present, and future infringement of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, software, including source code and operating standards; goodwill; general intangibles including, but not limited to, state, federal and local government tax refunds, mailing lists, customer lists, supplier lists and other lists and data in whatever form maintained, trade secret rights, rights in works of authorship, and contract rights relating to computer software programs, in whatever form maintained, Borrower's rights under contracts with employees and third parties and proceeds therefrom; and Borrower's interest in other entities.  The property described above may be referred to as the "**Collateral**."

(b)     The security interest granted in paragraph 2.1(a) above shall secure the payment of the indebtedness evidenced by the Note, and the payment and performance of all other liabilities, debts and obligations of Borrower to Lender, absolute or contingent, due or to become due, now existing or hereafter arising including liabilities, debts and obligations arising pursuant to this Agreement and because of funds advanced in the future by Lender, all herein called "**Obligations**."

2.2     <u>Priority</u>.  The security interest granted in the Collateral pursuant to this Agreement is junior to existing security interests previously granted by Borrower in connection with Borrower's existing secured debt.

2.3     <u>Taxes</u>.  Borrower will pay all taxes and assessments of any nature that may be levied or assessed against the Collateral.

2.4     <u>Use of Collateral</u>.  Borrower will not use the Collateral in violation of any applicable statutes, regulations or ordinances.

2.5     <u>Preservation of Collateral</u>.  At its option Lender may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may place and pay for insurance thereon, may order and pay for the repair, maintenance and preservation thereof and may pay any necessary filing or recording fees.  Borrower shall reimburse Lender on demand for any payment made or any expense incurred by Lender pursuant to the foregoing authorization.  Until default, Borrower may have possession of the Collateral and use it in a lawful manner, and upon default Lender shall have the immediate right to the possession of the Collateral.

2.6     <u>Financing Statement Filings</u>.  Borrower agrees that one or more financing statements pertaining to the Collateral shall be filed with the office of the Secretary of State of the State of California.  Borrower will immediately notify Secured Party of any condition or event that may change the proper location for the filing of any financing statement or other public notice or recording for the purpose of perfecting security interest in the Collateral.

3.     <u>Representations and Warranties of Borrower</u>.  To induce Lender to enter into this Agreement, Borrower makes the following representations and warranties to Lender:

3.1     <u>Corporate Status</u>.  Borrower is duly incorporated, validly existing and in good standing under the laws of the State of California.  Borrower does not own or lease any material property or conduct any material business in any other state.  Borrower has corporate power and authority to own its properties and assets and to carry on its business as it is currently being conducted.  Borrower has corporate power and authority to enter into and perform this Agreement, and the Note, and to borrow hereunder.

3.2     <u>No Breach or Violation</u>.  This Agreement and the Note will not violate any provision of law or of any articles of incorporation or bylaws, or result in a breach of, or constitute a default or require any consent under, or result in the creation of any lien, charge, or encumbrance upon the property or assets of Borrower, any indenture or other agreement or instrument to which Borrower is a party or to which Borrower or its properties may be bound or affected, other than agreements with California Bank of Commerce and as specifically provided herein.

2

3.3 <u>Enforceability</u>. This Agreement and the Note have been duly authorized, executed and delivered and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect generally affecting creditors' rights. Except as previously disclosed in writing to Lender, this Agreement, along with all action required to fully perfect Lender's security interests hereunder, which action has been taken or completed, create and constitute, to the extent permitted by law, valid and perfected security interests in and to the collateral herein described enforceable against all third parties and secure the payment of the Borrower's obligations under this Agreement and the Note and any other obligations (monetary or otherwise) of Borrower to Lender.

3.4 <u>Litigation</u>. There are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against or affecting Borrower, or any of its assets, properties or rights, at law or in equity, by or before any court, arbitrator, administrative or governmental body or other person which, if determined adversely, would have a material adverse effect on the business, properties, condition (financial or otherwise) or operations of Borrower.

3.5 <u>Compliance With Laws and Contracts</u>. Borrower is not in violation or default with respect to any applicable law or regulation which affects the business, properties, condition (financial or otherwise) or operations of Borrower, nor is it in violation or in default with respect to any order, writ, injunction, demand or decree of any court, or any indenture, agreement or other instrument under which it is bound or may be bound, default under or violation of which might have an adverse effect on the business, properties, condition (financial or otherwise) or operations of Borrower or might result in the acceleration of the maturity of any of its indebtedness.

3.6 <u>No Subsidiaries</u>. Borrower has no subsidiaries or any other entity that directly, or indirectly through one or more intermediaries, is controlled by Borrower.

3.7 <u>Taxes</u>. Borrower has filed or caused to be filed all tax returns that are required to be filed, and has paid all taxes shown to be due and payable on such returns or on any assessments made against it, except for returns which have been appropriately extended, and all other taxes, fees or other charges imposed on it by any governmental authority, agency or instrumentality that have become due and payable (other than those the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with generally accepted accounting principles have been provided on the books of Borrower) and no tax liens have been filed.

3.8 <u>Authorized Officers</u>. The officers of Borrower executing this Agreement and the Note are duly and properly in office and fully authorized to execute such agreements or instruments.

3.9 <u>No Event of Default</u>. No event has occurred and is continuing which constitutes an Event of Default as defined in Section 4.1, or which, upon a lapse of time or notice or both, would become such an Event of Default.

4.      Default and Remedies.

      4.1      Default.  Borrower shall be in default under this Agreement upon the happening of any of the following events or conditions (an "**Event of Default**"):

           (a)      The failure to pay or perform any obligation under this Agreement following not less than seven (7) days' advanced notice to Borrower  or the Note;

           (b)      Any representation or warranty made by Borrower in this Agreement or any writing furnished in connection with or pursuant to this Agreement shall be false in any material respect or shall omit any material fact on the date as of which made; or

           (c)      The dissolution or liquidation of Borrower, the appointment of a receiver for any part of the property of Borrower, the assignment for the benefit of creditors, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

      4.2      Remedies.  Upon an Event of Default, Lender may declare all obligations of Borrower under this Agreement and the Note immediately due and payable, and may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to Lender, all the rights and remedies of a secured party under the California Uniform Commercial Code.

5.      Miscellaneous.

      5.1      Attorneys' Fees and Expenses.  If either party to this Agreement commences any action or proceeding against the other party by reason of any breach or alleged breach of any term or condition of this Agreement or the Note, or for the interpretation of this Agreement or the Note, or with respect to any other claim arising in any manner whatsoever out of this Agreement or the Note, the prevailing party in such an action or proceeding shall be entitled to recover its reasonable attorneys' fees (including attorneys' fees on appeal, and costs and expenses incurred in out-of-court negotiations, workouts, and/or settlements or in seeking relief from stay or otherwise seeking to protect its rights in any bankruptcy proceeding) and all reasonable costs (including costs of consultants and experts) incurred. The court shall determine the prevailing party. The term "**expenses**" as used herein means any expenses incurred in connection with any of the out of court or state, federal or bankruptcy proceedings referenced above, including but not limited to the fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by such party.  In addition the prevailing party shall be entitled to its attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce the judgment. This provision is separate and several and shall survive the merger of this Agreement or the Note into any judgment on this Agreement or the Note.

      5.2      Governing Law and Jurisdiction.  This Agreement shall be governed by and construed under the laws of the State of California.  The state courts of the State of California shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement. Each of the parties hereby expressly consents to (1) the personal jurisdiction of the courts of California and (2) service of process being effected upon it by registered mail sent to the address set forth at the end of this Agreement.

5.3     <u>Entire Agreement; Amendment</u>.  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement shall be effective unless in writing signed by the party to be charged.

5.4     <u>Waiver</u>.  No failure or delay on the part of Lender in exercising any right, power or privilege under this Agreement or the Note and no course of dealing between Borrower or any other person and Lender shall operate as a waiver hereof or thereof; nor shall any single or partial exercise of any right, power or privilege preclude any other further exercise of any other right, power or privilege.  No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Lender to any other or further action in any circumstances without notice or demand.

5.5     <u>Descriptive Headings</u>.  The descriptive headings of this Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

5.6     <u>Successors and Assigns</u>.  This Agreement shall be binding upon each of the parties hereto, its successors and assigns.   Borrower may not transfer or assign any or all of its rights or obligations hereunder without the prior written consent of Lender.

5.7     <u>Notices</u>.  Any notice required or permitted by this Agreement shall be deemed given if sent by registered mail, postage prepaid, addressed to the other party at the address shown below such party's name on the last page of this Agreement or at such other address for which such party gives notice hereunder.  Delivery shall be deemed effective three days after deposit with the postal authorities.

5.8     <u>Severability</u>.  If any provision of this Agreement is held to be invalid by a court of competent jurisdiction, then the remaining provisions shall nevertheless remain in full force and effect.  The parties agree to renegotiate in good faith any term held invalid and to be mutually bound by the substitute provision.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

> KINGSBOROUGH ATLAST TREE SURGERY, INC., a California corporation
>
> By: *Richard Kingsborough*
> Richard Kingsborough, Chief Executive Officer
>
> Address:
> 1544 Ludwig Avenue
> Santa Rosa, CA 95407
>
> "Borrower"
>
>
> ANVIL BUILDERS INC.,
> a California corporation
>
> By: *Alan C. Guy*
> Alan C. Guy, Chief Executive Officer
>
> Address:
> 1550 Park Avenue
> Emeryville, CA 94608
>
> "Lender"

Exhibit 3

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Richard J. Leider**

B. E-MAIL CONTACT AT FILER (optional)
**Richard@AnvilBuilders.com**

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

**Mr. Richard J. Leider
Anvil Power Inc DBA Atlas Tree Surgery
1550 Park Avenue
Emeryville, CA 94608**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Kingsborough Atlas Tree Surgery, Inc.** | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1544 Ludwig Avenue** | **Santa Rosa** | **CA** | **95402** | **US** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Anvil Builders Inc** | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1550 Park Avenue** | **Emeryville** | **CA** | **94608** | **US** |

4. COLLATERAL: This financing statement covers the following collateral:
   **See description of Collateral as set forth on Exhibit A attached hereto.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☑ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

## EXHIBIT A

UCC-1 Financing Statement
Debtor:  Kingsborough Atlas Tree Surgery, Inc.


      All present and future tangible and intangible property of Debtor, including, but not limited to, (1) goods, inventory, work in process, finished goods, equipment, furniture and proceeds therefrom, (2) money, documents, instruments, accounts, chattel paper, and (3) licenses, franchises, permits, patents, patent rights, copyrights, works which are the subject matter of copyrights, trademarks, trade names, trade styles, patent and trademark applications and licenses and rights thereunder, and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing, and all rights to sue for past, present, and future infringement of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, software, including source code and operating standards; goodwill; general intangibles including, but not limited to, state, federal and local government tax refunds, mailing lists, customer lists, supplier lists and other lists and data in whatever form maintained, trade secret rights, rights in works of authorship, and contract rights relating to computer software programs, in whatever form maintained, Debtor's rights under contracts with employees and third parties and proceeds therefrom; and Debtor's interest in other entities.

# Exhibit 4

 

**License #952883**
February 5, 2025

**Via Email and Registered Mail**

Richard Kingsborough
CEO, Kingsborough Atlas Tree Surgery, Inc.
1544 Ludwig Ave.
Santa Rosa, CA 95407
kingsboroughrich@gmail.com

RE:     Outstanding Principal Balance Owing Under Line of Credit and Security Agreement
        $4,619,490.28

Dear Mr. Kingsborough:

The purpose of this letter is to memorialize the presently outstanding principal balance of the Advances that Anvil issued to, or for the benefit of, Kingsborough Atlas Tree Surgery, Inc. ("KBA") under the terms of the June 5, 2023 Line of Credit and Security Agreement between KBA and Anvil. As it stands today, the principal outstanding balance of the Advances owing to Anvil by KBA is $4,619,490.28.

Since 2023, Anvil has regularly shared information with KBA regarding the status of the outstanding Advances as well as the revenues and costs of all of the various projects which were transferred to Anvil at the time Anvil acquired KBA assets. Furthermore, every Advance made by Anvil was done at the request of KBA.

For your convenience, I have attached a spreadsheet itemizing the Advances and reflecting the outstanding principal balance of $4,619,490.28.

Please note that the principal balance of $4,619,490.28 is exclusive of interest and attorney's fees. Moreover, please be advised that KBA owes Anvil a substantially larger principal balance under the terms of the June 5, 2025 Asset Purchase Agreement and various other agreements.

Very Truly Yours,

Anvil Builders, Inc.

Richard J. Leider, Secretary

cc:  Cindy Kingsborough (via email, cindykingsborough@gmail.com)

1550 Park Avenue, Emeryville, CA 94608
T (415) 285-5000 | F (415) 285-5005
www.anvilbuilders.com

| Inv Date | Description | Advance/Credit |
|---|---|---|
| 12.31.24 | KBA Receivable (CBC LOC payoff) | 2,698,988.08 |
| 2/2/24 | *CBC payoff line of credit* | *2,669,572.78* |
| 2/2/24 | *CBC true-up letter of credit* | *29,415.30* |
| 12.31.23 | KBA Receivable (Payments to CAT Financial) | 663,197.18 |
| 12/12/23 | *Purchase Option for (8) CAT 279D Loaders* | *302,034.01* |
| 12/13/23 | *CAT Financial - KBA Payment Oct* | *17,912.02* |
| 12/13/23 | *CAT Financial - KBA Payment Nov* | *33,237.15* |
| 12/21/23 | *CCG Payment (CAT Eq Buyout)* | *310,014.00* |
| | | |
| 12.31.24 | KBA Receivable (KBA Payroll, CCG LOC) | 1,495,184.00 |
| 5/18/23 | *Trsf API to KBA, PR* | *590,000.00* |
| 5/25/23 | *Trsf API to KBA, PR* | *590,000.00* |
| 6/16/23 | *LOC - Billy K (CCG May)* | *315,184.00* |
| | | |
| 09.18.23 | Armada-1st Finance | 96,548.34 |
| | | |
| 07.11.23 | EQ Equity Pmts-Armada | 155,572.68 |
| | | $  5,109,490.28 |
| | | |
| | | |
| | Description | Offset |
| | | |
| | Anvil Power Fixed Component to Atlas (less PTO) | 490,000.00 |
| | | |
| | | |
| | | $  4,619,490.28 |

# Exhibit 5



**License #952883**

February 5, 2025

**Via Email and Registered Mail**

Richard Kingsborough
CEO, Kingsborough Atlas Tree Surgery, Inc.
1544 Ludwig Ave.
Santa Rosa, CA 95407
kingsboroughrich@gmail.com

RE:     Line of Credit and Security Agreement
         Event of Default
         Election of Acceleration of Repayment of Outstanding Obligation

Dear Mr. Kingsborough:

This letter is to notify you that Kingsborough Atlas Tree Surgery, Inc. ("KBA") has caused an Event of Default under the terms of the June 5, 2023 Line of Credit and Security Agreement (the "LOC") between KBA and Anvil. Accordingly, Anvil is hereby declaring all of the obligations of KBA, under both the LOC as well as the June 5, 2023 Subordinated Secured Promissory Note (the "Note"), as immediately due and payable.

As noted in a separate letter we sent you today, the present principal outstanding balance owing to Anvil, under the LOC is $4,619,490.28. That principal amount is therefore immediately due and payable to Anvil plus interest and fees.

KBA's relevant Events of Default of the LOC include, but are not limited to, express representations and warranties that were false at the time the LOC was executed on June 5, 2025.

- In paragraph 3.4 of the LOC, KBA represented that (as of June 5, 2023) there were "no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against or affecting Borrower…"

- In paragraph 3.5 of the LOC, KBA represented that (as of June 5, 2023) it was "not in violation or in default with respect to…any…agreement or other instrument under which it is bound or may be bound, default under or violation of which might have an adverse effect on the business…or might result in the acceleration of the maturity of any of its indebtedness."

Anvil has learned that KBA's paragraph 3.4 and 3.5 representations were false. As of June 5, 2023, KBA had breached numerous agreements with Greentek Services, LLC and owed it over $2.8 Million. The breached agreements, of which breaches were ongoing as of June 5, 2023,

1550 Park Avenue, Emeryville, CA 94608
T (415) 285-5000 | F (415) 285-5005
www.anvilbuilders.com




**License #952883**

included a breached subcontract agreement and a breached promissory note. Anvil has learned that Greentek sent written correspondence to KBA, prior to June 5, 2023, wherein it formally declared KBA in default of the agreements and threatened legal action because of those failures. Indeed, Greentek made good on its threats of litigation several days after June 5, 2023 and filed a lawsuit against KBA for the breached agreements. Greentek ultimately recovered a judgment against KBA for over $2.9 Million.

- In paragraph 3.7 of the LOC, KBA represented that (as of June 5, 2023) it "has paid all taxes [that]… were due and payable."

Anvil has learned that KBA's paragraph 3.7 representations were also false. As of June 5, 2023, KBA owed hundreds of thousands of dollars in taxes that had been overdue for years. In fact, it appears that the State of California imposed tax liens on KBA due to the long overdue taxes that had gone unpaid for years.

Paragraph 4.1(b) of the LOC dictates that a false express representation shall constitute an Event of Default under the terms of the LOC. Accordingly, each and every one of KBA's aforementioned false representations constitute an Event of Default under the LOC.

Paragraph 4.2 of the LOC dictates that upon an Event of Default, Anvil may declare all obligations under the LOC and the Note immediately due and payable.

As set forth above, Anvil hereby exercises its rights and declares a principal balance of $4,619,490.28 immediately due and owing.

Please issue the outstanding payment owing under the LOC immediately.

Very Truly Yours,

Anvil Builders, Inc.

Richard J. Leider, Secretary

cc: Cindy Kingsborough (via email, cindykingsborough@gmail.com)